UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH PETER SCHMITT | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 2004-10451-RWZ |
| | ) | |
| JEFFREY SMITH, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

I.   Introduction

The plaintiff pro se, Joseph P. Schmitt ["Schmitt"], was convicted and sentenced to serve four to eight years in the custody of the Massachusetts Department of Correction [the "Department"]. Schmitt filed the instant complaint dated February 20, 2004, alleging that the procedures by which he was found guilty of a disciplinary matter in March and April of 2002, while an inmate at MCI-Cedar Junction, violated his procedural due process rights.

On August 9, 2002, Schmitt's criminal sentence expired and he was transferred to the Massachusetts Treatment Center where he is currently an involuntarily civilly committed person adjudged to be sexually dangerous under Massachusetts law. Schmitt's complaint also appears to challenge the Department's authority to prohibit him from possessing or mailing sexually explicit material involving young men or children while housed at the Treatment Center.

2

Specifically, he asserts that his First and Eighth Amendment rights are violated and that his "right against sexual discrimination guaranteed by the Massachusetts Declaration of Rights" is violated by the institution's disciplinary rules. Schmitt cites 42 U.S.C § 1983 and Mass. Gen. Laws, c. 231A and c. 214, §1 as the jurisdictional basis of his claims.

The named defendants include the Massachusetts Department of Correction, Peter Allen, the former Superintendent of MCI-Cedar Junction, Ernest Therien and William Faria, respectively the disciplinary officer and hearing officer at MCI-Cedar Junction, and Jeffrey Smith and William Grossi, both inner perimeter security officers at the institution. Each is purportedly sued in their official and individual capacities.

II.     Statement of Undisputed Fact

Schmitt was convicted of two counts of rape of a child and sentenced to serve four to eight years in the custody of the Massachusetts Department of Correction.[1] During 2002, he was incarcerated at MCI-Cedar Junction, a maximum security institution.[2]

On March 20, 2002, Schmitt received a prison disciplinary report, #02-0563, charging him with violating three disciplinary rules as follows:

> #2   violating any departmental rule or any other rule, regulation, or condition of an institution or community based program;
> #8   conduct which disrupts or interferes with the security or orderly running of the institution;
> #33  attempting to commit any of the above offenses, making plans to commit any of the above offenses or aiding another person to commit any of the above offenses shall be considered the same as the commission of the offense itself.[3]

---

[1]     Affidavit of Robert Murphy, paragraph 4. The Murphy Affidavit is submitted separately herewith.
[2]     Id.
[3]     Certified Administrative Record, pages 25 and 26. The Certified Administrative Record for Disciplinary Report 02-0563 is submitted separately herewith. Pages 33-41 of the Record contains the letter in issue and those pages are included in the court's copy of the Record but have been removed from a copy provided to Schmitt.

3

These charges, filed by defendant Jeffrey Smith, stemmed from a determination that Schmitt had authored a letter to Joseph Chavez, an inmate incarcerated in New Mexico. The letter contained a sexually explicit story pertaining to sexual acts with a child.[4]

The Department inmate mail regulations restrict both incoming and outgoing mail that "jeopardize[s] institutional security, order, rehabilitation, or the public safety" or if it "interfere[s] with institutional goals of security, order, discipline, or if it might facilitate, encourage, or instruct in criminal activity." 103 Code of Mass. Regs. 481.14(1) (outgoing mail); 481.15(2) (incoming mail).[5] The regulations further specifically prohibited mail containing "sexually explicit material that by its nature or content poses a threat to the security, good order, or discipline of the institution" or that "[ d]epicts, [d]escribes or encourages activities that may lead to the use of physical violence or group disruption… or encourages or instructs in the commission of criminal activity." 103 Code of Mass. Regs. 481.15(2) (g), (e), (f). In addition, the Department inmate property regulations provide that any property that is not approved for retention is contraband. 103 Code of Mass. Regs 403.06.

On April 2, 2002, a prison disciplinary hearing was held before hearing officer, William Faria.[6] Schmitt was found guilty of violating any departmental rule or any other rule, regulation, or condition of an institution or community based program (offense #2) and sanctioned with 12

---

[4] Certified Administrative Record, pages 33-41. The disciplinary report was the third of a trio of reports issued to Schmitt for essentially the same conduct. The two prior disciplinary reports are the subject of his related civil action in this Court, Schmitt v. Mulvey, et al., 2004-CV-10717-RWZ.
[5] A copy of 103 CMR 481.00 et seq. (effective 12/8/00) is attached hereto as Exhibit A for the Court's convenience.
[6] Id., pages 27-30.

4

weeks loss of television, radio and phone privileges.[7] Schmitt appealed the finding and sanction to the Superintendent, defendant Peter Allen.[8] His appeal was denied.[9]

Schmitt remained at MCI-Cedar Junction until August 9, 2002, when he was transferred to the Massachusetts Treatment Center for the Sexually Dangerous.[10] The same inmate mail regulations applicable to inmates at MCI-Cedar Junction applied to Schmitt at the Treatment Center and additionally material is subjected to prohibition if it would "interfere with the treatment and rehabilitation process" at the Treatment Center.[11]

    III.    <u>Argument</u>

    A.    <u>The Rules and Regulations Prohibiting Schmitt from Possessing or Mailing Sexually Explicit Material Involving Children at MCI-Cedar Junction Did Not Violate His First Amendment Rights.</u>

"The fact of confinement and needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." <u>Jones v. North Carolina Prisoners' Union</u>, 433 U.S. 119, 125 (1977). A correctional policy that impinges on an inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests." <u>Turner v. Safley</u>, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). In <u>Turner</u>, the Supreme Court set forth several factors that "serve to channel the reasonableness inquiry." <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 414, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). The four factors are:

---

[7]     Certified Administrative Record, page 30. The remaining charges were dismissed.
[8]     <u>Id.</u>, pages 2-10.
[9]     <u>Id.</u>, page 2.
[10]    Murphy Affidavit, paragraph 4.
[11]    103 CMR 481.15(3)(b) (effective 4/26/02). This current version of the mail regulations is attached hereto as Exhibit B for the Court's convenience.

5

(1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it;[12] (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates and prison resources generally; and, (4) whether obvious, easy alternatives to the regulation exist.

Turner, 482 U.S. at 89, 90.[13]

Here, Schmitt appears to challenge the rule prohibiting his possession or mailing of sexually explicit material involving children while serving a sentence for rape of a child at a maximum security correctional institution. Such a restriction has a rational connection to the successful treatment and rehabilitation of inmates, especially sex offenders such as Schmitt.[14] "The Supreme Court has often characterized rehabilitation as one of the primary goals of penal institutions." Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998) *cert. denied,* 119 S.Ct. 2365 (1999).

As the Circuit Court in Amatel noted:

"[T]here is a significant body of research showing that long-term exposure to pornography, …can make its male audience more aggressive, more tolerant of violence against women, and more susceptible to myths about rape, such as the notion that women enjoy being raped."

---

[12] "To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future. See Thornburgh, 490 U.S. at 417. Moreover, it 'does not matter whether [the court] agree[s] with' the defendants or whether the policy 'in fact advances' the jail's legitimate interests. See Amatel v. Reno, 156 F.3d at 199. The only question that [the court] must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought the policy would advance its interests." Mairo v. Arpaio, 188 F.3d 1059 (9th Cir. 1999).

[13] This standard has been applied by the Massachusetts Supreme Judicial Court in analyzing prisoner claims. See Cacicio v. Secretary of Public Safety, 422 Mass. 764, 773 (noting inmate phone regulations do not deny right to effective assistance of counsel and that inmates may make unmonitored telephone calls).

[14] Murphy Affidavit, paragraphs 6-11; Affidavit of John Luongo, paragraphs 6-11. The Luongo Affidavit is submitted separately herewith.

6

Amatel, 156 F.3d at 200. In the context of a maximum security prison, housing numerous inmates convicted of sexual offenses, there is a rational connection between a ban on sexually explicit material and both rehabilitation and safety.[15] See Powell v. Riveland, 991 F.Supp. 1249, 1251-1253 (W.D. Wash. 1997) (extended discussion of the problems sexually explicit materials cause prison administrators). In addition, the rule is designed to prevent the harassment of female officers and treatment providers and to help preserve institutional security.[16] These reasons have been used to uphold numerous restrictions on the First Amendment rights of inmates. See e.g., Waterman v. Farmer, 183 F.3d 208 (3rd Cir. 1999) (upholding ban on sexually oriented material in correctional treatment center for sex offenders);   Mauro v. Arpaio, 188 F.3d 1054 (9th Cir. 1999) cert. denied 529 U.S. 1018, 120 S.Ct. 1419 (2000) (upholding ban on sexually explicit materials including pictorials that show frontal nudity); Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998) cert. denied, 119 S.Ct. 2365 (1999) (upholding ban on sexually explicit material or material featuring nudity).

Schmitt's attempt to draw some distinction or reject categorization of his own writing as "child pornography," "obscenity," or "sexually explicit" is not material to this Court's decision. See Cline v. Fox, 266 F.Supp.2d 489, 496-497 (N.D. Virg. 2003) (rejecting inmate attempts to characterize material as "erotic novels" or "erotic literature" and noting correction officials reasonableness in concluding the policy prohibited the material). Similarly, here - despite Schmitt's protestation that he is merely describing events from his own youth - a review of his writings in both this case and the related action, Schmitt v. Mulvey, et al., 2004-CV-10717-RWZ, expose the writings as nothing more a collection of the same type of "graphically

---

[15]   Luongo Affidavit, paragraph 2 and paragraphs 6-11.
[16]   Id., paragraphs 3 & 8; Murphy Affidavit, paragraphs 3 & 8.

7

described sexual escapades" banned in Cline. Id. The writing clearly is "sexually explicit material" banned by the rules.[17]

Moreover, the prison officials rationally can view Schmitt's writing, involving sexual acts between children, as an added threat to institutional security and order. This is particularly true given Schmitt's history of rape of a child.

As to the second Turner factor, Schmitt had numerous opportunities to exercise his First Amendment rights. He was free to write compositions and manuscripts concerning any number of events, thoughts, and experiences he wished. The rule only prevented Schmitt from possessing and mailing sexually explicit material. See Thornburgh v. Abbott, 490 U.S. 401, 418, 109 S.Ct. 1874 (1989) (ban on all sexually explicit material that poses a threat to security, discipline, and good order satisfies second factor because regulations still permit broad range of publications). Schmitt was free to subscribe to numerous publications, receive books from publishers and other approved sources and a prison library was available to him.[18]

The third and fourth factors also weigh in favor of the defendants. There are no reasonable alternatives to the policy. While some inmates who are sex offenders might not be adversely affected by possessing sexually explicit material, any limited allowance of such material would require a case by case review by professional staff.[19] Neither MCI-Cedar

---

[17] To this Court and the defendants Schmitt has variously characterized the material as a "coming out" story of "past sexual adventures" (Complaint, paragraph 13); a "sexual story about myself" and "my youthful sexual experience" (Complaint, Exhibit A, Notice of Intent dated March 21, 2002). In a March 4, 2004, letter to the clerk Schmitt found it necessary to include the boxed warning "Attention! Sexually Explicit Material Attached". A copy of the letter is attached hereto as Exhibit C.

[18] 103 CMR 403.10(7)(d) (10) (an inmate is authorized to possess a maximum of ten books, magazines, or newspapers); 103 CMR 478.00 et seq. (library resources and materials at all facilities with more than 200 inmates).

[19] Murphy Affidavit, paragraph 11; Luongo Affidavit, paragraph 11.

8

Junction nor the Treatment Center is sufficiently staffed for such reviews.[20]  Further, a limited allowance of such material would be ineffective, as prisoners are more than likely to pass their material to other prisoners.[21]

Accordingly, Schmitt fails to state a First Amendment claim.[22]

B.   The Rules and Regulations Prohibiting Schmitt from Authoring, Possessing, or Mailing Sexually Explicit Material at the Treatment Center Do Not Violate His First Amendment Rights.

In addition to the above-cited reasons that Schmitt was not entitled to possess and mail sexually explicit material involving children at MCI-Cedar Junction, the unique character of the population at the Massachusetts Treatment Center adds additional basis support for such a ban at Schmitt's current place of incarceration.  Indeed, the inmate mail regulations specifically provide that mail and materials "that may interfere with the treatment and rehabilitation process" at the Treatment Center may be excluded.[23]  The restriction has a rational connection to the successful treatment and rehabilitation of sex offenders and the maintenance of order in a facility designed to treat sex offenders.[24]

In a very recent case, the Court of Appeals of Kansas reviewed a correctional policy providing that inmate sex offenders are not permitted to have sexually explicit material in their possession.  Hill v. Simmons, 101 P.3d 1286, 2004 Kan. App. LEXIS 1251 (Dec. 10, 2004).  In Hill, the Court rejected the inmate's contention that such a rule violated his First Amendment and 14th Amendment due process rights, rather, finding all four of the *Turner* factors met, the

---

20   Id.
21   Id.
22   Article 16 provides no greater rights to Schmitt.  See Cacicio v. Secretary of Public Safety, 422 Mass. 764, 774 (1996) (applying federal Turner standard to Article 16 challenge to inmate telephone system).
23   103 CMR 481,15(3)(b); Affidavit of Robert Murphy, paragraph 5.

9

Court determined that the restriction was reasonable and rationally connected to legitimate penological interests. Id.

Similarly, Schmitt's First Amendment argument fails in the face of the existing policy at the Massachusetts Treatment Center for the Sexually Dangerous, which prohibits the possession of sexually explicit material.

    C.    The Process Used In Connection with Schmitt's Disciplinary Hearing Did Not Violate Any Due Process Rights.

Under the Federal Constitution, an inmate is entitled to the protections of the due process clause only when an existing liberty or property interest is at stake. See Sandin v. Connor, 515 U.S. 472, 484 (1995). A liberty interest is infringed only if the punishment inflicted upon the inmate imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (disciplining prisoner for 30 days in segregated confinement did not represent atypical, significant deprivation).

Here, Schmitt was sanctioned with 12 weeks loss of television, radio and phone privileges. Such a meager sanction did not impose "atypical and significant hardship in relation to the ordinary incidents of prison life" on Schmitt. See Sandin, 515 U.S. at 484 (thirty days segregated confinement not atypical); Dominique v. Weld, 73 F.3d 1156, 1160-1161 (1st Cir. 1996) (transfer of inmate to a more secure prison does not constitute an atypical, significant deprivation giving rise to a liberty interest protected by the due process clause)); Drayton v. Commissioner of Correction, 52 Mass. App. Ct. 135, 138 (2001) (*citing* Kentucky v. Thompson, 490 U.S. 545, 460 (1989) (federal due process does not give rise to unfettered visitation). Accordingly, Schmitt had no liberty interest to which due process requirements might attach.

---

24    Murphy Affidavit, paragraphs 6-11.

10

Even assuming Schmitt has some protected liberty interest he received all of the process due. Federal due process concerns require that a prisoner facing disciplinary charges that may result in the loss of liberty must receive "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and to present documentary evidence in his defense; (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action." Superintendent, Massachusetts Correctional Institution v. Hill, 472 U.S. 445, 454 (1985) (citing Wolff v. McDonnell, 418 U.S. 539, 563-567 (1974)). There need be only **some** evidence in the record to support the hearing officer's decision. Hill, 472 U.S. at 454.

It is clear from the Administrative Record regarding disciplinary matter 02-0563 that each of these due process requirements was met. Although Schmitt in his unverified complaint claims that he requested the reporting officer, Jeffrey Smith, as a witness at the hearing, the disciplinary office received no such request and none appears in the administrative record.[25] Moreover, Schmitt admits he wrote and attempted to mail the sexually explicit story regarding children, he simply claims that the writing does not violate the rules.[26] It did not violate Schmitt's due process rights to deny him a witness to testify as to facts that Schmitt admits.

The only other substantive claim Schmitt appears to make regarding the conduct of he disciplinary hearing itself is that the hearing officer was not impartial because Schmitt had brought several prior legal actions against him. Courts have long rejected the notion that an inmate may successfully claim impartiality of a disciplinary hearing officer simply by filing lawsuits against the officer. See e.g., Redding v. Fairman, 717 F.2d 1105, 1113 (7th Cir. 1983),

---

[25] See Certified Administrative Record.
[26] Complaint, paragraph 13.

11

*cert. denied*, 465 U.S. 1025, 79 L. Ed. 2d 685, 104 S. Ct. 1282 (1984) (inmate's due process right to a fair hearing was not necessarily violated where a member of a disciplinary board was also a named defendant in an unrelated civil suit); Rizzo v. Bureau of Prisons, No. 84-1884, 1985 WL 550, at *3 (S.D.N.Y. Apr. 25, 1985) (prison official named as defendant by plaintiff in another suit not disqualified as hearing officer).

While due process requires an impartial hearing officer, conclusory allegations are insufficient. See McGuinness v. Dubois, 1995 WL 169500 (D.Mass.) (unpublished), aff'd 887 F.Supp. 20 (D.Mass.1996), *rev'd on other grounds, aff'd in part* 75 F.3d 794 (1st Cir. 1996) (complaint challenging impartiality of disciplinary hearing officer fails "[i]n the absence of allegations of specific facts indicating bias or other improper motive"). "The degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir.1989).[27] In his concurring opinion in Wolff, Justice Marshall stated that "due process is satisfied as long as no member of the disciplinary board has been involved in the investigation or prosecution of the particular case, or has had any other personal involvement in the case." 418 U.S. at 592. The Third Circuit has relied on this language to hold that only those who were personally involved with the plaintiff's case must be disqualified from acting as hearing officers. Rhodes v. Robinson, 612 F.2d 766, 773 (3d Cir. 1979). The Seventh Circuit elaborated on this reasoning in holding that an court noted that mandatory disqualification of every member of a disciplinary committee who was also a named defendant in a suit by the prisoner would be overly burdensome to prison staff. In addition, such a rule would create the potential for abuse by encouraging prisoners to file

---

[27] Interestingly, Schmitt made a similarly unfounded claim of impartiality in this very civil action by filing a Motion to Recuse which he later withdrew.

12

multiple lawsuits in order to control the composition of a hearing board. Redding v. Fairman, 717 F.2d 1105, 1113 (7th Cir. 1983).  The Ninth Circuit has held that a prison officer who participates in the investigation or review, provides testimony concerning, or has personal knowledge of material facts leading to a disciplinary hearing cannot be impartial as matter of law. Clutchette v. Procunier, 497 F.2d 809, 820 (9th Cir.1974), *rev'd on other grounds sub nom.* Baxter v. Palmigiano, 425 U.S. 308 (1976).

Under these principles, Schmitt has not presented a genuine issue of material fact indicating that Hearing Officer Faria was not impartial.  Schmitt raised no issues at the hearing or on appeal to the superintendent indicating that Faria had witnessed or investigated the events alleged in the disciplinary report, or that he otherwise had a stake in the outcome of the matter. See McMaster v. Pung, 984 F.2d 948, 952 (8th Cir.1993) (no evidence of bias where hearing officers were not involved in the incident).

D.    The Defendants Are Entitled to Qualified Immunity.

All law enforcement officers hailed into court in their individual capacities to respond in damages are entitled to qualified immunity from suit in civil rights actions under §1983, provided their conduct did not violate clearly established statutory or constitutional rights of which a reasonable [police officer] would have known.   See  Hegarty v. Somerset County, 53 F. 3d 1367, 1372 (1995) quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In order to determine if a public official is entitled to qualified immunity, courts must determine if the right asserted by the plaintiff is clearly established at the time of the violation.  If so, it is appropriate to assume that the defendant official recognized the right and immunity will be denied only if a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.  Hegarty, 53 F.3d 1367 at 1373 (citations

13

omitted). Moreover, it should be noted that because qualified immunity is a shield against the burdens of litigation, not merely a defense against liability for money damages, relief on such grounds should take place prior to trial. Id., citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)(deciding case at summary judgment stage).

In the instant case, Schmitt's claim that he was entitled to retain a 9 page sexually explicit writing in violation of the rules of the Department and institution in which he was located, were not clearly established. Rather, the law as applied to these facts, to the extent it has been established, is in defendants' favor. See e.g., Thornburgh v. Abbott, 490 U.S. 401, 418, 109 S.Ct. 1874 (1989) (ban on all sexually explicit material that poses a threat to security, discipline, and good order satisfies second factor because regulations still permit broad range of publications); ); Mauro v. Arpaio, 188 F.3d 1054 (9th Cir. 1999) cert. denied 529 U.S. 1018, 120 S.Ct. 1419 (2000) (upholding ban on sexually explicit materials including pictorials that show frontal nudity); Waterman v. Farmer, 183 F.3d 208 (3rd Cir. 1999) (upholding ban on sexually oriented material in correctional treatment center for sex offenders).

IV.     Conclusion

For the foregoing reasons, defendants' motion to dismiss should be allowed or, in the alternative, summary judgment granted in defendants' favor.

14

> Respectfully submitted,
> Defendants Jeffrey Smith, William Grossi,
> Peter Allen, William Faria, Ernest Therien
> and the Massachusetts Department of
> Correction,
>
> By their attorneys:
>
> NANCY ANKERS WHITE
> Special Assistant Attorney General
>
>
> _____/s/ Philip W. Silva_____
> Philip W. Silva, Esq.
> Bridgewater State Hospital
> 20 Administration Road
> Bridgewater, Massachusetts 02324
> (508)279-4543
> B.B.O. No. 548175

I hereby certify that a true copy of the above document was served upon each party appearing pro se by mail on February 25, 2005.

　　　　 /s/ Philip W. Silva_____
　　　　Philip W. Silva, Esq.